# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

YVES L. LAMOTHE,              )
                                      )
                 Plaintiff,         )
                                        )
                      v.             )      No. 1:17-cv-01608-JMS-DLP
                                        )
FEDERAL EXPRESS CORPORATION,    )
                                        )
                 Defendant.    )

## ORDER

Plaintiff Yves Lamothe, an African-American male who was born in 1968, worked for Defendant Federal Express Corporation ("FedEx") for over eighteen years. During his tenure, Mr. Lamothe initially worked as a part-time handler, before becoming a lead aircraft technician. After FedEx terminated Mr. Lamothe's employment, he brought this lawsuit alleging race discrimination under Title VII of the Civil Rights Act of 1964 and age discrimination under the Age Discrimination in Employment Act. FedEx moved for summary judgment, [Filing No. 53], and that motion is now ripe for the Court's review.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot

produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that

they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed in Part I. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  Mr. Lamothe's Employment at FedEx from 1988 through 2016

From 1988 until 2016, Yves Lamothe was employed by FedEx in various capacities. [Filing No. 53-1 at 13-15.] Mr. Lamothe began working for FedEx in Los Angeles, California in 1988 as a part-time handler or clerk/sorter. [Filing No. 53-1 at 13.] At the time, he was finishing work on his Bachelor of Science degree in aerospace engineering technology, which he received from Northrop University in 1990. [Filing No. 53-1 at 12.] In June 1991, Mr. Lamothe moved to Memphis, Tennessee to start the maintenance training program at FedEx. [Filing No. 53-1 at 13.] After a year, he returned to Los Angeles to complete the maintenance training program. [Filing No. 53-1 at 13.] In 1993, Mr. Lamothe became a junior aircraft technician, first in Los Angeles and then in New York City. [Filing No. 53-1 at 14.] In 1996, Mr. Lamothe was transferred to Indianapolis, Indiana, where he became a senior aircraft technician. [Filing No. 53-1 at 14.] After a two-year job in Atlanta, Georgia as a senior technician from 1998 to 2000, Mr. Lamothe returned

to Indianapolis, Indiana where he worked as lead of aircraft maintenance from 2000 until 2016. [Filing No. 53-1 at 14-15.]

As part of his job as a lead of aircraft maintenance, Mr. Lamothe would assign tasks to a crew of 15 to 20 technicians and would monitor those tasks, but he was not a manager. [Filing No. 53-1 at 16; Filing No. 53-1 at 67.] During the relevant period of time, he worked the day shift, which began at 5:00 a.m. and ended at 3:30 p.m. [Filing No. 53-1 at 16.] During the day shift, lunch was from 11:00 a.m. to 11:30 a.m., the first break of the day was from 8:00 a.m. to 8:15 a.m., and the second and final break of the day was at 2:00 p.m. [Filing No. 61-4 at 5.]

FedEx used a program for clocking in and clocking out called Meteor, which stands for "Maintenance Enhanced Time Entry and Online Reporting." [Filing No. 53-1 at 19; Filing No. 53-3 at 2.] To clock in using Meteor, an employee would swipe his or her ID card when arriving at work. [Filing No. 53-1 at 20-21.] If Meteor did not show that an employee had clocked in or out, the employee would fill out a Meteor exception form on a computer. [Filing No. 53-1 at 21.] Employees also filled out Meteor exception forms to request time off or to leave early. [Filing No. 53-1 at 24.] In order to request leave, an employee would ask his or her manager verbally, and then the employee would put it in Meteor. [Filing No. 61-4 at 6.] Employees did not clock in or out if they were eating lunch on the premises or taking breaks during the day. [Filing No. 53-1 at 25-26; Filing No. 62-1 at 2.]

Mr. Lamothe's managers during the relevant time period were Clarence Craig, Harvey Jinks, Sal Ramos, and Mark Vontrager. [Filing No. 53-1 at 27-28.] Mr. Craig was Mr. Lamothe's manager for one week while Mr. Jinks was on assignment elsewhere. [Filing No. 61-4 at 6-7.] Gary Lyons was a senior manager. [Filing No. 53-1 at 93.]

During his employment with FedEx, Mr. Lamothe received copies of the employee handbook and the People Manual. [Filing No. 53-1 at 15; Filing No. 53-4 at 2.] He was also familiar with FedEx's Acceptable Conduct Policy and understood that a violation of that policy could result in immediate termination. [Filing No. 53-1 at 95.] Section 2-5 of FedEx's People Manual contains the Acceptable Conduct Policy, which provides that the following "may result in severe disciplinary action up to and including termination for employees:"

- Falsification of Company documents or records including, but not limited to, business reports, delivery records and time cards (start time or break times)

[Filing No. 53-7 at 18.] In addition, the People Manual also states that "an employee normally would be dismissed upon completion of an investigation confirming violations related to" falsification of company documents and records "if falsification was for personal gain or benefit." [Filing No. 53-7 at 20.] The People Manual gave the following example:

Example No. 1: Investigation confirms employee falsified time card to obtain pay for hours not worked by claiming hours when the employee was not at work. Employee would be terminated because the falsification was for personal gain or benefit.

[Filing No. 53-7 at 20.]

### B. Conversation between Mr. Craig and Mr. Iozzio

Sometime in the first half of 2015, while he was in the locker room, Mr. Lamothe overheard Jeffrey Iozzio say to Mr. Craig, "I'm going to get that f---ing n----r." [Filing No. 53-1 at 69.] Mr. Lamothe did not hear Mr. Craig say anything in response. [Filing No. 53-1 at 69.] Mr. Craig was not a manager at the time – he was a senior technician. [Filing No. 53-1 at 66.] Mr. Craig became a manager sometime in early 2016. [Filing No. 53-1 at 86.] Mr. Lamothe did not say anything to Mr. Iozzio, a manager, or human resources at that time. [Filing No. 53-1 at 69-70.] Mr. Lamothe never heard Mr. Craig say anything inappropriate about him, his race, [Filing No. 53-1 at 70], or his age, [Filing No. 53-1 at 93].

**C. Mr. Lamothe's Early Departure from Work on August 27, 2016 and the Termination of his Employment at FedEx**

On August 27, 2016, Mr. Lamothe requested an hour of personal time off at the end of the work day and requested to leave at 2:30 p.m. rather than 3:30 p.m. [Filing No. 53-1 at 31; Filing No. 53-3 at 2.] His request was approved in Meteor by Mr. Craig. [Filing No. 53-4 at 5; Filing No. 53-5 at 2.] He did not let a manager know on August 27, 2016 that he was leaving early. [Filing No. 53-1 at 36.]

Mr. Craig researched footage from the video system in the facility and discovered that Mr. Lamothe had exited the facility on foot at 2:10 p.m. and drove away from the facility at 2:12 p.m. [Filing No. 53-4 at 6; Filing No. 53-5 at 2.]

The next time Mr. Lamothe came to work – August 30, 2016 – he was told to go to a conference room. [Filing No. 53-1 at 34.] There, Mr. Craig asked Mr. Lamothe what time he had left work on August 27, 2016, and Mr. Lamothe replied that he had worked his "regular time." [Filing No. 53-1 at 35.] While in the conference room, Mr. Lamothe produced a written document in which he stated that he "did not [leave] on the 27th of August 2016 . . . . On the 27th of August we had an extended 3:10 pm meeting. I did not [leave] early." [Filing No. 53-2 at 1; Filing No. 53-1 at 36.] Mr. Lamothe was then informed that he was suspended with pay pending an investigation of the potential violation of FedEx's acceptable conduct policy. [Filing No. 53-1 at 35; Filing No. 53-2 at 3.] During the meeting Mr. Lamothe did not tell anyone that he felt like he was being singled out for discipline or that his suspension was wrong. [Filing No. 53-1 at 42.] He signed a letter of suspension the same day. [Filing No. 53-2 at 3.] The letter instructed Mr. Lamothe to "stay in town and [be] accessible by phone during normal operational hours." [Filing No. 53-2 at 3.]

Upon returning to his home, Mr. Lamothe called Joe Trimpe and Sam Ramos, both of whom instructed Mr. Lamothe to contact Mr. Craig. [Filing No. 53-1 at 35.] At 6:10 A.M. that morning, Mr. Lamothe sent Mr. Craig a message that read as follows:

> Hello Clarence, sorry for the mis understanding. I did asked you for an hour P/B to go to my son football game. His mother called me and I didn't have to go. I did use the one hour P/B because I left an hour early. I don't know regarding meteor. I would never do anything to Disrespect you or your Position, I've always had great respect for you. Thank you for for your understanding . Have a blessed day. Peace of the Lord be with you Always.

[Filing No. 53-2 at 2.]

At some time thereafter, Mr. Lamothe's father died and he called Mr. Craig and Mr. Trimpe to inform them that he would need to leave town for the funeral. [Filing No. 53-1 at 41.] While Mr. Lamothe was in Miami for his father's funeral, Mr. Craig contacted him and informed him that he needed to come back to meet with human resources. [Filing No. 53-1 at 42.]

Meanwhile, Mr. Craig, assisted by human resources advisor Joseph Trimpe, [Filing No. 53-6 at 1-2], investigated Meteor documents and video footage, [Filing No. 53-5 at 3], that showed that:

- on June 18, 2016, Mr. Lamothe requested and was granted one hour of leave from 2:30 to 3:30 p.m., [Filing No. 53-4 at 8], and left the facility on foot at 1:52 p.m. and by car at 1:54 p.m., [Filing No. 53-4 at 9];

- on June 22, 2016, Mr. Lamothe requested and was granted one hour of leave from 2:30 to 3:30 p.m., [Filing No. 53-4 at 11], and left the facility on foot at 2:02 p.m. and by car at 2:03 p.m., [Filing No. 53-4 at 12];

- on July 28, 2016, Mr. Lamothe requested and was granted one hour of leave from 2:30 to 3:30 p.m., [Filing No. 53-4 at 14; Filing No. 62-2 at 3], and left the facility on foot at 1:37 p.m. and by car at 1:40 p.m., [Filing No. 53-4 at 15; Filing No. 62-2 at 3]; and

- on August 17, 2016, Mr. Lamothe requested and was granted one hour of leave from 2:30 to 3:30 p.m., [Filing No. 53-4 at 17; Filing No. 62-2 at 3-4], and left the facility on foot at 2:13 p.m. and by car at 2:16 p.m., [Filing No. 53-4 at 18; Filing No. 62-2 at 4].

Upon Mr. Lamothe's return to Indianapolis, on or about September 16, 2016, he met with Mr. Craig and Mr. Trimpe at FedEx. [Filing No. 53-1 at 43.] At the meeting, he was given a form with a number of dates on it and blank lines asking whether he clocked out in Meteor on June 18, 2016, June 22, 2016, July 28, 2016, and August 17, 2016 and asking what time he left the facility on each of those days. [Filing No. 53-2 at 4.] Mr. Lamothe wrote "Do not Recall" on each blank line. [Filing No. 53-2 at 4.] In addition, the form asked:

In your statement dated 8/31/2016, you stated that "you've never had any problem relating to clocking in and clocking out". Can you explain why you did not clock out in Meteor on the dates in the previous questions?

[Filing No. 53-2 at 5.] In response, Mr. Lamothe wrote that he did not recall not clocking out on those days and that "anything that I am doing, I always informed my manager and ha[ve] always got permissions." [Filing No. 53-2 at 5.]

On September 22, 2016, FedEx sent Mr. Lamothe a letter informing him that his employment was being terminated, effective the same day. [Filing No. 53-2 at 6.] The letter provided as follows:

On August 27, 2016, at the Indianapolis Hangar Maintenance facility, you requested and received approval to use one hour of personal business at the end of your shift. You failed to clock out in Meteor and video surveillance footage shows that you left the facility without authorization 20 minutes prior to your adjusted shift end time.

Our resulting investigation revealed four other recent occurrences where you requested and received approval to use personal business time at the end of your shift, failed to clock out in Meteor and left the facility without authorization prior to your adjusted shift end time.

- June 18, 2016: you left the facility at 13:52, 38 minutes early.
- June 22, 2016: you left the facility at 14:02, 28 minutes early.
- July 28, 2016: you left the facility at 13:37, 53 minutes early.
- August 17, 2016: you left the facility at 14:13, 17 minutes early.

[Filing No. 53-2 at 6.]

**D. FedEx's Guaranteed Fair Treatment Process**

FedEx's guaranteed fair treatment process ("GFTP") allows an employee "[t]o fill out a form to explain yourself and to express why you feel this has taken place, if it is fair or not." [Filing No. 53-1 at 53.] The GFTP "provides a procedure for handling employee complaints regarding discipline or other eligible issues," including termination. [Filing No. 53-7 at 8.] The GFTP consists of 3 levels of review: (1) review by the managing director; (2) review by an officer; and (3) an appeals board review. [Filing No. 53-6 at 3.]

Mr. Lamothe filled out a GFTP form on or about September 26, 2016, in which he stated that he worked full time on each of the dates referenced in the termination letter. [Filing No. 53-2 at 10.] In addition:

- Mr. Lamothe stated that on June 18, 2016, he "was given permission by Manager, Sal Ramos to take [his] lunch break toward the end of the shift;"

- Mr. Lamothe stated that on June 22, 2016 he "was given permission by Mr. Ramos to leave for the same reason" as on June 18;

- Mr. Lamothe stated that on July 28, 2016, he "was given permission by Mr. Ramos to take . . . a normal break time" at the end of the day;

- Mr. Lamothe stated that on August 17, 2016, he "was given permission by Mr. Ramos to leave" for the same reason as on the previously identified days; and

- Mr. Lamothe stated that

> On August 27, 2016, I left work 20 minutes prior to time because I had a family emergency to attend to. I did not realize that I didn't clock out until I returned to work on August 31, 2016 and was approached by Mr. Sal Ramos, Mr. Clarence Craig and HR Manager, Joseph Trimpe. At that time, I was put on paid suspension. Normally upon situations of not clocking out, employees are given the opportunity to fill a meteor exception form, which I was not given.

[Filing No. 53-2 at 10.] In addition, in the GFTP, Mr. Lamothe stated as follows:

> I believe I have been treated unfairly by Mr. Clarence Craig, who has been waiting for the right time to get me back for an incident which occurred when I was his lead. Approximately 18 months ago, I had a disagreement with Mr. Craig's friend Jeffrey Iozzio (#108708). After that, I heard Mr. Iozzio described me to Mr. Craig using a racial epithet and noted that Mr. Craig did not admonish Mr. Iozzio for that. Less than one week after he became my manager, Mr. Craig suspended me for the August 27 incident. Mr. Craig had never informed me that the timecard exception policy had changed, never explained his expectations for me as Lead, and never warned me that forgetting to clock out was a terminable offense.

[Filing No. 53-2 at 11.]

Sometime thereafter, Mr. Lamothe filled out a second GFTP form in which he requested a reversal of his employment termination and identified two employees who he alleged received different treatment than him – Julian Hepburn and Manny Iglasias. [Filing No. 53-2 at 12.]

### E. Other FedEx Employees

F. During his 28 years working for FedEx, Mr. Lamothe never saw anyone's employment with FedEx terminated for a first-time violation of any FedEx policy. [Filing No. 61-3 at 2.]

Patrick Kikendall was a 56 year old Caucasian man whose employment with FedEx was terminated on August 23, 2017 for violating FedEx's firearm and weapons policy. [Filing No. 61-8 at 5.] At the time his employment with FedEx was terminated, Mr. Craig was Mr. Kikendall's manager. [Filing No. 53-5 at 2.]

Manuel Iglesias was a 58 year old man whose employment with FedEx was terminated in 2015 for violating FedEx policy for receiving three warning letters in a twelve month period. [Filing No. 61-8 at 7; Filing No. 61-7 at 2; Filing No. 62-1 at 2.] Mr. Iglesias was a lead airport mechanic at FedEx's Indianapolis, Indiana hangar. [Filing No. 61-7 at 2.] In Mr. Iglesias' experience, employees in FedEx's Indianapolis, Indiana hangar "were not uniformly held to the requirements of FedEx company policies pertaining to work breaks, lunch breaks, and clocking out." [Filing No. 61-7 at 1.] In particular, Mr. Iglesias recalls that it was common for workers to take longer breaks than company policy allowed. [Filing No. 61-7 at 1-2.] During his employment with FedEx, Mr. Iglesias was not a member of management, did not have access to any employee files, and did not have responsibility for enforcing FedEx policy. [Filing No. 62-1 at 2.]

Andy Eagler was a 46 year old who worked in the Avionics Department and was under the supervision of Jim Snow. [Filing No. 53-5 at 1-2.] Mr. Eagler's employment with FedEx was terminated for bringing an ammunition cartridge into the facility, but he returned to work following the GFTP. [Filing No. 53-5 at 2.]

After the termination of Mr. Lamothe's employment, FedEx replaced him with Thomas Valentine, a white male who was 50 years old in September 2018. [Filing No. 61-9 at 3; Filing No. 62-1 at 1.]

### G. The Lawsuit

Mr. Lamothe initiated this lawsuit on May 17, 2017, setting forth claims for age and race discrimination, and filed the operative Amended Complaint on September 15, 2017. [Filing No. 1; Filing No. 25.] FedEx has moved for summary judgment, [Filing No. 53], and that Motion is now ripe for the Court's decision.

## III.
### DISCUSSION

At the outset, the Court notes that there are a number of disputed facts in this case. As set forth in Part I, however, a disputed fact is material only if it might affect the outcome of the suit under the governing law. *Hampton*, 561 F.3d at 713 (7th Cir. 2009). In this case, the facts in dispute are not outcome determinative, and the Court considers the record in the light most favorable to Mr. Lamothe, consistent with the summary judgment standard.

FedEx argues that it is entitled to Summary Judgment on both of Mr. Lamothe's claims. The Court discusses each claim in turn.

### A. Age Discrimination

FedEx also that Mr. Lamothe's age discrimination claim fails because "he cannot establish with direct evidence that age was a determining factor in his termination." [Filing No. 54 at 19.] In addition, FedEx argues that Mr. Lamothe "cannot meet the fourth prong to establish *a prima facie* case" because he has not presented valid comparators. [Filing No. 54 at 20.] Of the two individuals identified by Mr. Lamothe, FedEx argues that one is older than Mr. Lamothe and the other "is junior in age only by a couple of years." [Filing No. 54 at 20.] Moreover, FedEx argues that neither is similarly situated to Mr. Lamothe because their infractions were "wholly unrelated to falsification of company records pursuant to the Acceptable Conduct Policy." [Filing No. 54 at 20-21.] Further, FedEx argues that it "has articulated a legitimate, non-discriminatory reason for

terminating Plaintiff, which is his falsification of company records," [Filing No. 54 at 22], and that Mr. Lamothe "does not have any evidence of FedEx being dishonest in the explanation of why [he] was terminated or that there [are] any inconsistencies or contradictions in the reasoning relied upon by FedEx," [Filing No. 54 at 23].

In his response brief, Mr. Lamothe argues that he "does not need to identify a similarly situated individual outside of his protected class to prove his age discrimination claim." [Filing No. 60 at 28.] In addition, Mr. Lamothe argues that he "can identify additional evidence that suggests age was the 'but for' cause of his termination" because FedEx "terminated the employment of Mr. Kikendall (58-years-old), Mr. Iglesias (58-years-old), and Mr. Shuminsky (57-years-old)" and "had a practice of hiring younger individuals." [Filing No. 60 at 28.] In addition, Mr. Lamothe argues that the "evidence in this case requires that the questions of liquidated damages under the ADEA and punitive damages under Title VII be decided by the jury." [Filing No. 60 at 29.]

In its reply brief, FedEx contends that "opposition to summary judgment is not the appropriate time" to raise a theory that FedEx has "a practice of discriminating against individuals above the age of 40." [Filing No. 63 at 19.] In addition, FedEx argues that contrary to Mr. Lamothe's assertion, the facts in this case "simply do not suggest that FedEx has a standard operating procedure of discriminating against individuals over 40 in the position of Lead Aircraft Technician." [Filing No. 63 at 20.]

The Seventh Circuit has recently "clarified the singular question that matters in a discrimination case: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894

(7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).   The Seventh Circuit has "abolished the distinction between 'direct' and 'indirect' evidence of discrimination" and has instead stated that "[e]vidence is evidence." *Seymour-Reed v. Forest Pres. Dist. of DuPage Cty.*, 2018 WL 4944826, at *2, __ Fed. App'x __, (7th Cir. Oct. 12, 2018) (quoting *Ortiz*, 834 F.3d at 765).

However, the "well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson*, 892 F.3d at 894 (citing *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)).   Although the Seventh Circuit has stated that there is "no magic to this test; it is merely one way of culling the relevant evidence . . . ," the Court of Appeals has also noted that it is "helpful" and can be used to evaluate a plaintiff's claims by looking to see whether the plaintiff (1) is a member of a protected class; (2) performed reasonably on the job in accord with his employer's legitimate expectations; (3) was subjected to an adverse employment action despite reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer. *Id.* at 894-95.

The parties in this case present their arguments in the context of *McDonnell Douglas* and the Court will therefore follow suit.

Turning to the last factor, Mr. Lamothe needs to show "that he was 'singled out for worse treatment' than similarly situated employees." *Seymour-Reed*, 2018 WL 4944826, at *3 (quoting *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007)).   "[A]n employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their employer's treatment of them." *Lauth v. Covance, Inc.*,

863 F.3d 708, 716 (7th Cir. 2017) (citations and quotations omitted). "[I]n order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a 'comparable set of failings.'" *Abrego v. Wilkie*, 2018 WL 5603034, at *4, __ F.3d __ (7th Cir. Oct. 30, 2018) (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)). "To determine whether two employees have engaged in similar misconduct, the proper inquiry is whether their conduct is of 'comparable seriousness.'" *Young v. Brennan*, 2018 WL 5734264, at *2 (7th Cir. Nov. 1, 2018) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012)).

Mr. Lamothe identified five men who he claims are his comparators but, viewing the facts in the light most favorable to him, the evidence before the Court does not support a finding that any of these individuals are similarly situated to Mr. Lamothe. First, with regard to the two individuals who Mr. Lamothe contends were disciplined for bringing weapons and firearms onto the FedEx premises, such individuals did not have a "comparable set of failings" to Mr. Lamothe, such that they can be called similarly situated. *See Abrego*, 2018 WL 5603034, at *4. Mr. Lamothe contends that the other three individuals were not disciplined despite taking additional time off during break and lunch times. But here again, the evidence before the Court makes it clear that such behavior is distinguishable from Mr. Lamothe's actions. In his deposition, Mr. Lamothe admitted that FedEx employees did not clock in or out if they were eating lunch on the premises or when they took breaks during the day. [Filing No. 53-1 at 25-26.] It therefore follows that any failure to adhere to the allowed time limits for lunch or a break would not involve the falsification of Meteor records because such breaks were not recorded in Meteor. By contrast, Mr. Lamothe's employment was terminated for the falsification of company documents. [Filing No. 53-2 at 6 (September 22, 2016 termination letter citing a violation of Section 2-5 of the Acceptable Conduct

Policy and listing as "Falsification Co Doc" in the letter heading); Filing No. 53-7 at 18 (FedEx's Acceptable Conduct Policy, stating that falsification of company documents "may result in severe disciplinary action up to and including termination for employees").]

Without citing to any caselaw or evidence, Mr. Lamothe makes the additional argument that he "does not need to identify a similarly situated individual outside of his protected class to prove his age discrimination claim." [Filing No. 60 at 28.] It is true that in the context of a reduction in force, ("RIF"), the Seventh Circuit has dispensed with the requirement that the plaintiff show "similarly situated" employees who were treated more favorably. *See Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) (stating that because "of the fear that employers might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job," the Circuit has "dispensed with the requirement that the plaintiff show 'similarly situated' employees who were treated more favorably," and instead requires that the plaintiff "demonstrate that his duties were absorbed by employees who were not members of the protected class"). However, Mr. Lamothe has not argued that he was subject to a RIF, and even if his termination could be characterized as such, the evidence shows that Mr. Lamothe was replaced with a male who was 50 years old in September 2018. [Filing No. 61-9 at 3; Filing No. 62-1 at 1.] Therefore, for the purposes of Mr. Lamothe's age discrimination claim, he was replaced by an employee who was a member of his protected class.

To the extent that Mr. Lamothe's underdeveloped argument regarding comparators is that under *Ortiz*, the Court need not hew strictly to *McDonnell Douglas*, he is correct. But Mr. Lamothe's additional evidence similarly fails to raise a genuine issue of material fact as to whether age bias motivated FedEx to terminate his employment. In fact, Mr. Lamothe's evidence consists

of one comment concerning race that he overheard 18-months prior to the termination of his employment and has nothing to do with age discrimination. [Filing No. 53-1 at 67 (Mr. Lamothe's deposition, in which he stated that he "felt that because of" the racially disparaging comment, Mr. Iozzio "wanted to get back at" him and that he "think[s] that's why all of this came about."]

Based on the foregoing, Mr. Lamothe cannot demonstrate a prima facie case of discrimination based on age. However, even if he could, he would not be able to make the required showing that FedEx's reasons for suspending and firing him were pretextual. "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a non-discriminatory reason for the adverse action," and if the employer is "able to do so, the burden shifts again to the employee to show that the reason given was pretext." *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 n.3 (7th Cir. 2018). The "pretext analysis evaluates the honesty of the employer's explanation, not its validity or reasonableness." *Seymour-Reed*, 2018 WL 4944826, at *3 (citing *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013)). Put another way, "it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee," rather, "the only question is whether the employer's proffered reason . . . was a lie." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018) (citations and quotations omitted); *see also Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (stating that "to show pretext," a plaintiff "must establish both that a phony reason (not just an unfounded one) was given for [the] discharge").

The Seventh Circuit has observed that the "similarly situated and pretext analysis often overlap, as comparator evidence and selective enforcement of an employer's rules are relevant to both inquiries." *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) (citing *Coleman*, 667 F.3d at 857-59). But, as previously discussed, Mr. Lamothe's comparators are not similarly

situated, so their comparisons do not demonstrate pretext. Instead, Mr. Lamothe must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in FedEx's asserted reasons, such that "a reasonable person could find [them] unworthy of credence." *Skiba*, 884 F.3d at 724 (citations and quotations omitted). However, nothing in the record raises a genuine issue of material fact as to pretext. Mr. Lamothe's evidence suggests that he disagreed with FedEx's reasons for terminating his employment and that he contends he had permission to leave early, but it does not suggest that FedEx lied about its reasons for firing him. Instead, the evidence shows that FedEx consistently contended that Mr. Lamothe was potentially in violation of its policy regarding the falsification of documents, while Mr. Lamothe changed his story multiple times throughout FedEx's investigation of his actions. [*See* Filing No. 53-1 at 38 (in which Mr. Lamothe admits that his initial statement to FedEx was not accurate); Filing No. 53-2 at 4-5 (in which Mr. Lamothe stated that he did not recall when he left or whether he clocked out on four previous occasions); Filing No. 53-2 at 10-11 (in which Mr. Lamothe contends during the GFTP process that he had permission to leave early).] Here again, Lamothe offers as evidence his mere belief that "the stated reason is not the real reason for his termination." [Filing No. 60 at 9.] But this is not enough to raise a genuine issue of material fact as to pretext.

Accordingly, Mr. Lamothe's age discrimination claim fails under both *McDonnell Douglas* and under the broader evidentiary considerations set forth in *Ortiz*. As such, FedEx's Motion for Summary Judgment as to Mr. Lamothe's age discrimination claim is **GRANTED**.

### B. Race Discrimination

FedEx also argues that Mr. Lamothe's race discrimination claim fails because he "lacks any direct or relevant evidence of race discrimination" and can only point to a single derogatory comment made by a co-worker 18 months prior to his termination. [Filing No. 54 at 15-16.] In addition, FedEx argues that Mr. Lamothe "cannot establish the fourth element of a prima facie

case of race discrimination" because he "presents no relevant evidence" that establishes that any of the three employees Mr. Lamothe identifies as similarly situated "failed to clock out or falsified any company documents." [Filing No. 54 at 16-17.] FedEx also argues that it "has articulated a legitimate, non-discriminatory reason for terminating Plaintiff, which is his falsification of company records." [Filing No. 54 at 22.]

In his response brief, Mr. Lamothe "identifies Greg Stockton, Victor Barnett, Jeff Iozzio, Patrick Kikendall, and Andy Eagler as Caucasian employees" who were treated more favorably "in the context of clocking-in and clocking-out of Meteor" as follows:

- he "witnessed Mr. Stockton and Mr. Barnett arriving late from their lunch break and not receiving any discipline for their late arrivals,"

- he "witnessed Mr. Iozzio in the break room for an extended amount of time outside of the allotted break hours, without receiving any form of discipline,"

- Mr. Kikendall "committed a dischargeable offense under the Acceptable Conduct Policy by bringing firearms on the premises and was given a second chance to come back," and

- Mr. Eagler "violated the Acceptable Conduct Policy by bringing bullets through security at the Hangar and was later returned to work by the Workplace Violence Board," and "was ultimately suspended for his second offense of bringing bullets through security at the Hangar; however, he was allowed to return despite committing a dischargeable offense,"

[Filing No. 60 at 21].  In addition, Mr. Lamothe argues that FedEx's contention that it had a legitimate, non-discriminatory reason for terminating Mr. Lamothe is "not supported by the evidence in this case." [Filing No. 60 at 23.]  Specifically, Mr. Lamothe contends that he "was given permission by his supervisors to adjust his hours, so that he could leave early from work"

on June 18, 2016, June 22, 2016, July 28, 2016, and August 17, 2016 and that he was told he could "leave early for personal emergencies and, the following day, could explain to his manager what happened." [Filing No. 60 23-24.] In addition, Mr. Lamothe contends that "the Hangar location, has a history of not uniformly holding its employees to the requirements of the FedEx company policies," in that "employees would normally and routinely take longer than the fifteen (15) minutes prescribed by company policy for their morning and afternoon work breaks" and "would commonly take longer than thirty (30) minutes for their lunch breaks, regardless of the company policy." [Filing No. 60 at 24.] Mr. Lamothe also argues that his manager never made him "aware of any alleged issues with clocking-in or clocking-out of Meteor, until he was suspended," and was never issued a warning letter. [Filing No. 60 at 24-25.] Mr. Lamothe contends that FedEx "selectively enforced the rules" against him, which "calls into question the veracity" of FedEx's explanation of his termination. [Filing No. 60 at 25.] Lastly, Mr. Lamothe argues that "Mr. Craig likely held a discriminatory animus towards" him dating from an incident in which " Mr. Iozzio told Mr. Craig, 'I'm going to get that [f---ing n----r]'" [Filing No. 60 at 26.]

In its reply brief, FedEx argues that Greg Stockton, Victor Barnett, and Jeff Iozzio, "did not engage in conduct similar to that of" Mr. Lamothe, who was accused of "leaving earlier than the approved time, followed by the falsification of company information regarding his actual departure time in Meteor," which "is a terminable offense, even without prior discipline." [Filing No. 63 at 13.] FedEx contends that this was "very different than the conduct he alleges Greg Stockton, Victor Barnett, and Jeff Iozzio engaged in; namely, arriving late from lunch or taking extended breaks." [Filing No. 63 at 15.] Moreover, FedEx argues that Mr. Lamothe "does not identify anyone who falsified company information who was not terminated." [Filing No. 63 at 16.] With regard to Kikendall and Eagler, FedEx contends that neither individual was "disciplined

or terminated for falsification of company information, but were terminated and disciplined under FedEx's Firearms/Weapons Policy." [Filing No. 63 at 16.] Further, FedEx argues that Mr. Lamothe "has still not met his burden to prove FedEx's proffered nondiscriminatory reasons for his termination are pretextual." [Filing No. 63 at 17.] FedEx argues that the "three former employees, who were not members of management thus lack[] personal knowledge regarding enforcement and interpretation of FedEx Policy as it pertains to termination of employees," and such former employees "were also not employed with FedEx at the time of the September 2016 employment decision to terminate" Mr. Lamothe. [Filing No. 63 at 17.] FedEx further argues that Mr. Lamothe's affidavit "fails to address each instance of falsification raised by FedEx, is inconsistent with his prior deposition testimony and fails to account for the time difference identified by FedEx during its investigation." [Filing No. 63 at 17.]

Once again, the parties set forth their arguments concerning Mr. Lamothe's race discrimination claim in terms of *McDonnell Douglas*, and here again, the Court's focus is on the fourth prong of *McDonnell Douglas*, under which the plaintiff must identify similarly situated employees outside of the protected class who were treated more favorably by the employer. *Johnson*, 892 F.3d at 894. However, Mr. Lamothe's attempt to identify similarly situated individuals for the purposed of his race discrimination claim fails for the same reasons set forth in the Court's analysis of his age discrimination claim: the individuals he identified did not have a "comparable set of failings" to Mr. Lamothe, and therefore cannot be called similarly situated. *Abrego*, 2018 WL 5603034, at *4. The behavior exhibited by Mr. Lamothe's comparators – whether bringing contraband to work or taking extended breaks – is distinguishable from Mr. Lamothe's actions in falsifying company documents. As such, the individuals Mr. Lamothe identified are not similarly situated employees under *McDonnell Douglas*.

And, just as he could not establish pretext with regard to his age discrimination claim, Mr. Lamothe cannot make the required showing that FedEx's reasons for suspending and firing him were pretext for race discrimination. *See Rowlands*, 901 F.3d at 801 n.3 (7th Cir. 2018) ("Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a non-discriminatory reason for the adverse action," and if the employer is "able to do so, the burden shifts again to the employee to show that the reason given was pretext"). Mr. Lamothe cannot identify "weaknesses, implausibilities, inconsistencies, or contradictions" in FedEx's asserted reasons for terminating his employment, such that "a reasonable person could find [them] unworthy of credence," *Skiba*, 884 F.3d at 724 (citations and quotations omitted), and indeed, nothing in the record suggests that FedEx lied about its reasons for firing him. Accordingly, even if Mr. Lamothe could demonstrate a prima facie case of discrimination based on race, he cannot make the required showing that FedEx's reasons for suspending and firing him were pretextual.

The Court now turns to Mr. Lamothe's evidence of race discrimination under the more broad lens of *Ortiz*, under which "[e]vidence is evidence." *Seymour-Reed*, 2018 WL 4944826, at *2 (quoting *Ortiz*, 834 F.3d at 765). Mr. Lamothe's claim additional evidence of discrimination largely consists of one comment concerning race that he overheard 18-months prior to the termination of his employment when a non-manager made a racially disparaging comment about Mr. Lamothe to Mr. Iozzio, who was not a manager at the time. [Filing No. 53-1 at 66; Filing No. 53-1 at 69; Filing No. 53-1 at 81.] But the Seventh Circuit has made clear that "'stray remarks' do not support an inference of discrimination unless the decisionmaker or someone with influence over the decision made the comment around the time of, or about, the adverse action." *Seymour-Reed*, 2018 WL 4944826, at *3 (citing *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007)).

Outside of the statement to Mr. Iozzio, Mr. Lamothe offers evidence of race discrimination that amounts to nothing more than his personal belief that he was discriminated against. [Filing No. 53-1 at 67 (Mr. Lamothe's deposition, in which he stated that he "felt that because of" the racially disparaging comment, Mr. Iozzio "wanted to get back at" him and that he "think[s] that's why all of this came about" and that it is "just [his] personal feeling").] However, this is not enough to support Mr. Lamothe's discrimination claims, as "personal beliefs are insufficient to give rise to a genuine factual dispute" over whether a plaintiff was the victim of discrimination. *Abrego*, 2018 WL 5603034, at *5 (citation omitted).

In short, Mr. Lamothe's race discrimination fails under *McDonnell Douglas*, and his additional evidence similarly fails to raise a genuine issue of material fact as to whether racial bias motivated FedEx to terminate his employment. Accordingly, FedEx's Motion for Summary Judgment as to Mr. Lamothe's race discrimination claim is **GRANTED**.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** FedEx's Motion for Summary Judgment, [53]. Final judgment shall enter accordingly.

Date: 11/15/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**